## CONTINENTAL SECURITIES CO. v. INTERBOROUGH RAPID TRANSIT CO. et al. (two cases).

### (District Court, S. D. New York. June 2, 1913.)

### Nos. 2—214 and 4—5.

1. INJUNCTION (§ 22*)—RIGHT TO RELIEF—CHANGE OF CONDITIONS PENDING SUIT.

   Equity acts in the present tense, and, although a bill by a stockholder against the corporation and others to enjoin the carrying out of a combination and conspiracy between them to create an illegal monopoly alleged facts which entitled complainant to the relief prayed for, an injunction will not be granted where at the time of the hearing conditions had so changed that the monopoly did not exist and was not threatened.

   [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 20, 21; Dec. Dig. § 22.*]

2. MONOPOLIES (§ 20*)—NEW YORK STATUTE—CONSTRUCTION.

   The provision of section 7 of the New York Stock Corporation Law (Laws 1890, c. 564), as amended by Laws 1892, c. 688, § 7, and Laws 1897, c. 384, § 1, which prohibits combinations between corporations or persons for the creation of a monopoly or the prevention of competition in any necessary of life, etc., as construed by the Court of Appeals of the state since the creation of the Public Service Commission, does not apply to public service corporations such as street railroad companies, which occupy streets under franchises and are subject to regulation by the commission.

   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 21–25, 17-43; Dec. Dig. § 20.*]

3. MONOPOLIES (§ 22*)—EFFECT ON RIGHTS—MORTGAGES—VALIDITY.

   That stockholders of a corporation assisted in forming an illegal combination did not affect their power to give a valid mortgage on the corporate property for a legitimate purpose having no connection with such combination.

   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 28, 28½; Dec. Dig. § 22.*]

4. CORPORATIONS (§ 189*)—STOCKHOLDER'S SUIT—GROUNDS.

   A single stockholder cannot maintain a suit to enjoin the corporation from violating a law of the state where he shows no personal loss or damage therefrom.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706-722; Dec. Dig. § 189.*]

5. WORDS AND PHRASES—"COMPETITOR."

   "Competitors" are persons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival. Unity of object with diversity of method is the essence of competition.

In Equity. Two suits by the Continental Securities Company against the Interborough Rapid Transit Company and others. On final hearing on original and supplemental bills. Decrees for defendants.

For former opinions, see 165 Fed. 945, and 203 Fed. 521.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

J. Aspinwall Hodge, of New York City, for complainant.

Richard Reid Rogers, of New York City, for corporate defendants other than Morton Trust Co.

Henry L. Stimson, of New York City, for Guaranty Trust Co., as successor to Morton Trust Co.

De Lancey Nicoll and Cortland V. Anable, both of New York City, for individual defendants.

HOUGH, District Judge. Some time is saved by settling the terminology to be used in considering these causes.

Interborough Rapid Transit Company is a corporation formed in 1902 for the purpose of taking over and operating the underground railway system then building under what was known as the McDonald contract with the city of New York. It is hereinafter called "the Interborough" and its railway system the "Subway."

Manhattan Railway Company is a corporation which before and at the formation of the Interborough was in control of and operated the railway system in Manhattan and Bronx, commonly known as (and hereinafter called) the "Elevated." The corporation is hereinafter called "the Manhattan."

Metropolitan Street Railway Company is a corporation which prior to February, 1902, controlled and operated very numerous street or surface car lines in Bronx and Manhattan, commonly known as and hereinafter called the "Metropolitan System"; the company itself is hereinafter called the "Metropolitan."

Metropolitan Securities Company is a corporation (hereinafter called "Securities Company") formed principally for the purpose of holding all the stock of the New York City Railway (hereinafter called "City Company"), to which concern the Metropolitan System was leased in 1902 for a very long term.

The individual defendants are divers persons who in and just before 1906 were interested and prominently concerned in the management of the affairs of the Interborough and Metropolitan System. Of them August Belmont is averred to be the chief actor in Interborough affairs and Thomas F. Ryan to hold a like position of influence if not control in Metropolitan matters.

The Interborough-Metropolitan Company (hereinafter called the "Inter-Met") is a corporation formed in early 1906 for the purpose of aiding "financially or otherwise any corporation engaged in the transportation of passengers in the city of New York or its suburbs or territory adjacent thereto," and with the widest possible powers of acquisition, retention, and disposition of the securities of other corporations.

The Windsor Trust Company is hereinafter called "Windsor Company"; the Morton Trust Company has been absorbed in or merged with the Guaranty Trust Company; but, as these trust companies are concerned in these causes only as trustees under certain mortgages, the phrase "Morton Company" will be understood to refer as well to the original trustee as to its successor.

These shortened names cover sufficiently all the defendants in both cases.

Jurisdiction depends wholly on diversity of citizenship, and complainant is a New Jersey corporation, owned by the Venner family, and in my judgment amply proven to be but one of the names under which Mr. Clarence H. Venner conducts some branch or branches of his business.

In action No. 1 (begun April, 1908) a demurrer was argued in the following December before Ray, J., whose opinion is reported in (C. C.) 165 Fed. 945. Nothing has occurred to change the rule that such decision is the law in this case, so far as proof has sustained allegation. That is, if the facts appear on final hearing to be the same as inferred by the court from the bill of complaint, it is my duty to adopt the view of law approved on demurrer, without regard to my own opinion. Judge Ray's analysis of the bill is most exhaustive and obviates the necessity of now stating facts except in so far as the evidence requires change.

Action No. 2 admittedly presupposes success in action No. 1. As No. 1 asserts the Inter-Met to be in essence a violation of the New York "Anti-Trust" Law (Consol. Laws 1909, c. 20, §§ 340–346) and demands therefore its shackling if not destruction, so No. 2 seeks to set aside a certain mortgage made November 1, 1907, to Morton Company by Interborough under the baleful and unlawful influence of Inter-Met. If the latter company be not the illegal thing asserted in No. 1, then the mortgage complained of in No. 2 cannot be touched, but Morton Company defends not only on the ground asserted by the defendants in No. 1 but by declaring that, even if all the allegations of the bill in No. 1 be true, the property rights created by the mortgage in question are protected and the mortgage itself a valid obligation in favor of the bondholders for whom Morton Company, as trustee, defends.

By supplemental bills in No. 2, complainant seeks to prevent the consummation of the so-called "Dual-Subway" scheme, by which the city of New York has recently contracted with the Interborough and Brooklyn Rapid Transit Company to permit and assist in the creation of new underground railways. The method of attack in these supplemental bills is to try to prevent the Inter-Met from voting Interborough stock, for without such vote the enormous mortgage necessary for the "Dual-Subway" scheme and approved by the Public Service Commission, over the complainant's protest, cannot legally be executed. Complicated as are these bills, the position of complainant may be simply stated thus: *owing to the* original, intentional, and inherent *illegality* of Inter-Met, *every act* done by it, or through its influence, to support and perpetuate said illegality is *null and void* and should *now by this court,* and at the single *instance of one small shareholder* in Interborough, be utterly set aside. Before considering these demands of complainant, the evidence may be reviewed only so far as it varies, enlarges, or explains the *allegata* of the bill as stated by Judge Ray. At page 950 of 165 Fed., it is stated that down to the time of formation of the Inter-Met the Interborough was engaged in "actual competition" with the Metropolitan System in the business of transporting passengers. In the sense that travelers could choose whether to go to many places by one route rather than the other, this needs no proof;

it is matter of common knowledge. But competition means more than such an opportunity for selection.

[5] Competitors are persons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival. Unity of object with diversity of method is the essence of competition; but, if methods become too widely separated, competition usually disappears, because the superiority of one must be admitted. Competition between sail and steam may still exist as to freight, but there is none as to passenger traffic. In this view of the word-meaning, the record contains no proof of competition between Interborough and Metropolitan.

Under the law as quoted at page 956 of 165 Fed., defendants' doings, to be obnoxious to the statute, must amount to either an unlawful restraint of trade, the prevention of competition in a necessary of life, or a monopoly. With which of these three epithets did Judge Ray brand the Inter-Met? Plainly, I think, it was declared a monopoly (pages 956, 957 of 165 Fed.), so that my inability to find any competition to suppress, actually existing in 1906, does not change the law of this case, as imposed by the demurrer decision. But in what does the monopoly consist? Evidently (page 957 of 165 Fed.) in "practically owning all the railroad lines * * * between the Bronx and the Battery, subject only to such control as the Public Service Commission may exercise." If, however, there was no actually existing competition to suppress, why should the Inter-Met have been formed (page 953 of 165 Fed.) "with the intent and purpose of acquiring * * * a large majority of the shares of" Interborough, Metropolitan, and Securities Company? The answer to this query is in my opinion plainly found in the testimony of Messrs. Ryan and Belmont (action No. 1, Ryan, Q. 38 et seq., Belmont, especially Q. 219 et seq. and Q. 465). The Metropolitan had exhausted the possibilities of surface transportation and with its enormous fixed charges could not earn dividends; but subways were new and of unknown capacity both as money-raisers and money-earners. It was a bold and ingenious move for the Metropolitan to put forward, as a possible addition to its system, connecting subways. This was done to the detriment of Interborough, whose managers saw plainly enough that subways must be extended, if successful, not only for financial but political reasons; and to have a bold rival in any plan for such extension seemed intolerable. This is shown by the evidence as the reason for Inter-Met, not the suppression of existing competition, as alleged in the bill. What was wished was elimination of a rival in any future bargaining with the city for subway additions and extensions. Whether the threatened rivalry was real, whether there was any substance in the threat of future competition, not in operating railways, but getting the chance to build them, is immaterial. From that motive resulted the "practical ownership" of all railways between Bronx and Battery (page 957 of 165 Fed.) which must be held monopoly in this case.

The demurrer decision at page 961 of 165 Fed. considers the allegations of the bill in respect of equity rule 94. The evidence shows that after Mr. Venner and the rest of the world knew what was proposed in respect of forming Inter-Met, but before it was done, he

caused to be bought in the name of and for complainant 300 shares of Interborough. The proofs show that since suit begun the Second and Third avenue street car lines, "Belt Line," and Union Railway Company have become separated from the Metropolitan System, as well as several cross-town lines. The dropping of cross-town lines seems to me immaterial, but it is obvious that, if there was any competition between Bronx and Battery in 1905, there is a great deal more in 1913. On the other hand, the prevention of competition in building new subways in Manhattan and Bronx continues, and the recent contracts for the "Dual System," considered in connection with Mr. Belmont's testimony, seem to show that "wisdom is justified of her children," for what was planned for in 1906 seems to have arrived in 1913, but to have so arrived in consonance with legislation passed since 1906 and, with the approval of the Public Service Commission, a creation of 1907.

With respect of the Windsor Company's mortgage (Inter-Met, 4½'s), the method of bond issue is shown, and every holder of Interborough stock could do just what he pleased; he could take the 4½'s as an overwhelming majority of shareholders did or take dividends as this complainant has done. As to Morton Company's mortgage, it is plain that every dollar of proceeds was expended for benefit of Interborough alone.

The result of the demurrer decision is that in December, 1908, and from a reading of the bill in action No. 1 only, it was decided, that (page 966 of 165 Fed.) "the rights of the public and of many stockholders" had been invaded, wherefore the action would lie.

[1] Reverting now to my attempted summary of complainant's position in 1913, the first inquiry is whether the original illegality of Inter-Met has continued; is it still an obnoxious monopoly under the law of New York? This is vital, for equity acts in the present tense.

The citation of decisions such as the Trans-Missouri Case are not in point. That obnoxious association was dead, and the Supreme Court wrote its epitaph; but, if it had been alive under conditions wholly different from those obtaining when bill filed, it would have been necessary to mold the decree to actualities not history.

The only monopoly declared from the allegata was "practical ownership" of all transportation lines from Battery to Bronx; that has been broken; it no longer exists. But what the evidence shows to have been the real object of Inter-Met (i. e., a monopoly of subway building) has been attained and retained nearly as fully in 1913 as in 1908. I conclude that the corporation constituted a monopoly in both years, if it was one at the earlier date.

[2] But is such monopoly obnoxious? It was so held five years ago. Since then much has happened, and complainant insists that even if the law of New York has changed, or if it has been better ascertained, I am still bound by the demurrer decision. This doctrine is denied.

This court is foreign to the state of New York; though it is bound to take judicial cognizance of state law, yet that law remains a fact to be ascertained as carefully (though in a different way) as any other

fact in the case. The evidences of the law are not only statutes but decisions certainly of the highest state court. A new statute or a new decision is new fact evidence, and I am bound to consider it.

In my opinion People v. Willcox, 207 N. Y. at 98, 100 N. E. 705,. is the best evidence yet available; that the Public Service Commission statutes mean what they suggest; and that in New York a monopoly regulated by law and subject to visitation is preferred in respect of public utilities over unrestricted competition. The Inter-Met therefore is not an *obnoxious* monopoly. Nor do I find Central N. Y.,. etc., Co. v. Averill, 199 N. Y. 128, 92 N. E. 206, 32 L. R. A. (N. S.) 494, 139 Am. St. Rep. 878, inconsistent with the case last cited. That relates to contracts in restraint of trade; no such question is here presented.

[3] The next query is whether even an admitted or proven infringement of the law by Inter-Met so far nullified its acts as to render void either the Windsor or Morton Company's mortgages. The Windsor Company took title to Interborough stock by the voluntary act of the several stockholders; it is well said that each shareholder took back a purchase-money mortgage on the same by accepting his 4½ per cent. bonds. The Windsor title to the stock rests on no act of the Inter-Met, and, no matter how illegal was the object of forming that corporation, the Windsor mortgage is valid. As to the Morton mortgage, it cannot be pretended that the act of Interborough shareholders in furthering by their deposit of stock a scheme of monopoly rendered it impossible for them to mortgage their corporate property for legitimate and nonmonopolistic purposes. This they did by the Morton mortgage, so that, even if to some extent action No. 1 could prevail, the main bill in action No. 2 must fail.

[4] Finally, is there any defect in these proceedings owing to the fact that they are brought by one shareholder who has shown no personal loss, damage, or injury whatever? Much time has been devoted to picturing the evil results of monopoly, but nothing has been done toward showing that complainant has lost a dollar by exactly what Mr. Venner knew was going to be done when he caused the stock to be purchased.

Rule 94 has, I think, been complied with; and although a complainant's motives are of great moment when he asks for relief resting in grace or discretion, when he insists on a legal right, his morality or honor are not material. The demurrer decision held that the rights of the public and of stockholders had apparently been invaded. It now appears that no stockholders' pecuniary rights have been lessened. It was not held that, in the absence of pecuniary damage, a single shareholder could take upon himself the pleasure or duty of vindicating the rights of the people of the state. That such is not the rule in New York is amply held in Thomas v. Musical, etc., Union,. 121 N. Y. 45, 24 N. E. 24, 8 L. R. A. 175, and intimated by the Circuit Court of Appeals, in respect of the statute here involved, in National, etc., Co. v. Mason-Builders' Ass'n, 169 Fed. 259, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148.

Because, therefore, complainant has shown no right to maintain these actions, because the existing mortgages attacked are valid hypothecations, even if assented to by the Inter-Met, and finally because the Inter-Met itself as it stands to-day is not shown to be an illegal monopoly, the bills are severally dismissed, with costs.