[Civ. No. 22844. Second Dist., Div. One. Oct. 15, 1958.]

FELIX MALLON, Plaintiff, v. CITY OF LONG BEACH et al., Respondents; ALMA SWART, Intervener and Appellant.

*Assigned by Chairman of Judicial Council.

Theodore R. Gabrielson for Intervener and Appellant.

Walhfred Jacobson, City Attorney, O'Melveny & Myers and Pierce Works for Respondents.

LILLIE, J.—Plaintiff in intervention Alma Swart appeals from a judgment denying a permanent injunction.

The city of Long Beach, as trustee, held in its possession certain revenues received by it under a trust which it had

used and intended to continue to use for general municipal purposes. These funds were derived from oil and gas developed on tide and submerged lands granted to the city by the State of California in 1911. Under this grant the state conveyed to the city of Long Beach all of the tide and submerged lands within the corporate limits of the city in trust for commerce, navigation and fishing.

In May, 1953, plaintiff Mallon, not an appellant herein, filed a "taxpayer's" suit against the city of Long Beach and various city officials to enjoin them from using the revenues in question for municipal purposes, claiming they could be expended only for the trust purposes of commerce, navigation and fishing. Appellant was permitted to intervene. Demurrers to the complaints were sustained and appellant appealed to the Supreme Court from the order sustaining the same.

In the meantime the city filed its answer admitting its intention to use 50 per cent of the oil and gas revenues and 100 per cent of the dry gas revenues for general municipal purposes and not for the trust uses designated by the grant and alleging that under Assembly Bill 3400 (Stats. 1951, ch. 915, p. 2443), hereinafter referred to as the Act of 1951, the funds had been released to it; that it owned the funds absolutely free from the terms of the trust and had a right to use them as its own.

On April 5, 1955, the Supreme Court rendered its opinion on the appeal from the order sustaining the demurrers (*Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481]), reversing the lower court and holding that the Act of 1951 effected a partial revocation of the trust over the tide and submerged lands releasing certain revenues from the trust, but that the monies were released *not to the city of Long Beach but to the State of California,* and operated to transfer to the state 50 per cent of the income from oil and gas and 100 per cent of the income (past, present and future) from dry gas derived from the city's tide and submerged lands.

After this decision and in July of 1955, the city amended its answer admitting the prior transfers of trust revenues into the municipal treasury, but contending it acted in good faith believing that under the Act of 1951 they had been released to it and therefore belonged to the city and that the expenditures were proper; and asserting that it would discontinue its prior practices of transferring and using the funds for its own purposes, did not intend to do so in the

future, and that an injunction to prevent further diversion of funds was not necessary.

Shortly thereafter in August of 1955 the state, seeking to recover the funds released to it under the ruling of the Supreme Court (*Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481]), unsuccessfully attempted to intervene in the instant case. On September 16, 1955, it filed an action of its own against the city entitled ''People of the State of California, et al. vs. City of Long Beach, et al., No. 649466, in the Superior Court of Los Angeles County'' (hereinafter referred to as the People's case) to recover the revenues. Negotiations for settlement arose and no proceedings were taken until after the Legislature passed the Act of 1956 (Stats., 1st Ex. Sess. 1956, ch. 29), effective July 5, 1956, which supplied legislative approval of settlement of the People's case, fixing the sum payable by the city to the state as $120,000,000, for all claims to the funds as of January 31, 1956, monthly payments by the city to the state for future accruals of 50 per cent of the oil and gas revenues and 100 per cent of the dry gas revenues, and providing the judgment to be rendered in the People's case to be final. Pursuant thereto a stipulated judgment was entered in the People's case on September 11, 1956.

Under the consent decree the city on October 31, 1956, paid to the state, in full settlement of all claims to the funds in question up to February 1, 1956, the sum of $122,339,133.89. It thereafter started making monthly payments as provided in the judgment and as far as we know has continued to do so.

The trial of the instant case was held in February of 1957 principally on the issue of whether a permanent injunction would lie against defendants to enjoin them from expending for general municipal purposes the trust funds already covered by the Act of 1956 and the judgment in the People's case. It revolved around the issue of defendants' good faith in abandoning their prior expressed intent to use the funds for other than trust purposes. The assistant city attorney of Long Beach who interpreted the Act of 1951 for the city council and gave it advice on all of its proposed actions; a former member of the city council from 1950 to 1954, now a judge of the Long Beach Municipal Court; a former mayor of Long Beach from 1942 to 1945; and the Long Beach city auditor testified on behalf of defendants. Numerous exhibits were received for both plaintiff and defendants, the

majority of which were city council resolutions. The plaintiff offered no testimony. Defendants' witnesses were questioned extensively about various transfers of funds, under what authority they were made, the city council's belief concerning the construction of the Act of 1951, its general intent then and now, and its activities in connection with certain prior court litigation and legislative action.

The trial court found, among other things, that defendants, although mistaken in their construction of the Act of 1951, believed in good faith that the funds, released from the tidelands trust thereunder (50 per cent of oil and gas revenues, and all past and future dry gas revenues), had been released to the city as absolute owner and not to the State of California; and as such they could use them as their own for general municipal purposes as distinguished from public tidelands or harbor purposes; that this belief and understanding was shared by the governor of the state, the then Legislature, the attorney general and the legislative counsel. The trial judge also found to exist certain changed conditions or circumstances since the filing of the action. In denying injunctive relief the court concluded that due to changed circumstances occurring subsequent to the commencement of the action "There is no reasonable expectation or probability that the acts complained of herein by plaintiff and by plaintiff in intervention will be either repeated or continued by defendants or any of them and no necessity for the granting of the injunctive relief prayed for herein now exists."

 The issue on this appeal is whether the trial judge abused his discretion in refusing the injunctive relief sought.

Appellant contends that since 1939 the city's conduct relating to its various transfers and use of trust funds for general municipal expenditures, its extended litigation over the use and ownership of the trust revenues and its lobbying activities in connection with the Act of 1951, clearly shows past deliberate "misappropriation of trust funds" and that the city's protestations that it has ceased its transfer and expenditure of revenues and intends no further such activities are not in good faith. Appellant argues that defendants' past conduct, not having been in good faith, they are not now in good faith in "abandoning" their previous intention to use the revenues as their own. To show that defendants are not to be trusted in the future she submits a history of the city's activities since 1939, which without doubt dis-

closes numerous efforts on the part of the city to free itself from the status of trustee and use the funds as its own. This history constituted part of the record considered by the trial court in determining whether defendants were in good faith in their assertions of abandonment of earlier activities to gain control of the funds.

The record discloses prior extended litigation by the city, most of which was instituted either by it, or its officials, in the form of "friendly suits" for judicial determination of its rights in the funds at various times.

The first, an original proceeding in the Supreme Court, was brought by the city against its port manager (*City of Long Beach* v. *Marshall*, 11 Cal.2d 609 [82 P.2d 362]) in 1938 to determine if it had the right to drill for oil on the tidelands. The court held it could develop the mineral resources but that the lands were conveyed in trust for commerce, navigation and fishing. Thereafter the city developed gas and oil on the tidelands, receiving substantial revenues therefor. It arranged through its municipal gas department to sell dry gas and place the revenues therefrom in the gas revenue fund. By council resolutions it transferred the funds to the general purpose fund for general municipal uses. The trial court herein, having heard the testimony of the city officials concerning these transfers and their explanation for the council's activities, concluded: "Now, with respect to their conduct after the Marshall case, so far as the holding of the Marshall case at least is concerned, I can't say that they deliberately violated that."

On December 30, 1947, suit was filed by the city against its treasurer (*City of Long Beach* v. *Morse*, 31 Cal.2d 254 [188 P.2d 17]), to force him to transfer money from the harbor fund to the public improvement fund for general use. The court held that since the tidelands were granted to the city in trust, proceeds from oil and gas development must be used for trust purposes (commerce, navigation and fishing). Thereafter substantial funds were transferred for municipal use. After hearing the testimony relating to the city's activities in this regard, the lower court admitted they presented "a much more serious problem." From its further statement, this obviously was taken into consideration in deciding the showing necessary to establish good faith, because the trial judge further related the city's conduct after the Morse case with subsequent acts to show good faith had reestablished itself in the city's later activities.

On January 25, 1951, an injunction suit was filed against the city (*Trickey* v. *City of Long Beach,* 101 Cal.App.2d 871 [226 P.2d 694]) to enjoin it from transferring trust funds into the general purpose fund. The court held that the "dry gas" income was part of the trust and could not be used for nontrust purposes.

Immediately after the court's decision in the Trickey case, in an attempt to "undo" the court's ruling, city officials lobbied in the Legislature. It resulted in the Act of 1951 which provided that 50 per cent of the oil and gas revenues on hand and to be derived in the future, and 100 per cent of the dry gas revenues, past, present and future, received by the city in its capacity as trustee, are "declared to be free from the public trust for navigation, commerce and fisheries, and such uses, trusts, conditions and restrictions as are imposed by any of said entitled acts." (Stats. 1951, p. 2443, § 2.) Appellant sharply criticized the conduct of city officials in lobbying for the passage of this act, accusing the (city) trustee of violating its duties and obligations to the beneficiary, withholding information from the Legislature and perpetrating a fraud upon the state, the Legislature and the People of the State of California.

However, the trial court after listening to the testimony of the city officials concerning their interest in the bill, their lobbying activities and their reasons and explanations therefor, said: "The plaintiff in intervention seems to take the view that there is something wrong, almost underhanded, in going to the Legislature to try to undo that (Trickey) case and to even get much more." The trial judge declared the city's acts were not only legitimate but that it is entirely proper "where you are dissatisfied with the law, to go to the people who make the laws and attempt to avoid the consequences of the law with which you are dissatisfied. I see nothing in the slightest wrong with going to the Legislature and seeking the legislation that they sought and having obtained the legislation."

After the Act of 1951 became effective, a public improvement fund was set up, the city transferred funds for general use, and authorized certain expenditures for the erection of municipal buildings and facilities. The evidence shows that the city relied upon its attorney's interpretation of the Act that the revenues belonged to it; that defendants at all times believed that the Act of 1951 released the funds from the trust to the city. Of this the trial judge said, "I see nothing un-

reasonable in the interpretation that they placed upon the law. They were wrong, but many other people were wrong, too, in the interpretation of that law, and consequently, the fact that they did not follow the law as it was ultimately construed by the Supreme Court in the Mallon case, was of course legally wrongful, but nothing morally wrongful. . . ." The court concluded from all of the evidence before it that the city had not acted in defiance of the law but on erroneous advice and under mistaken belief.

It was at this point the instant action was filed. The city, believing it had the right to use the funds, continued to do so up to the day of the Supreme Court's ruling on April 5, 1955 (*Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481]). Appellant claims that on the very day the decision was rendered the city transferred $980,000 for general use (Exhibit 34) and other sums by council resolution on October 4, 1955 (Exhibit 35), and on April 12, 1956 (Exhibit 36). The evidence showed that the transfer of $980,000 was actually made four days prior to April 5, 1955, and when the city council passed its resolution (Exhibit 34), it was unaware of the decision and that later all funds transferred subsequent thereto were restored as impounded trust money. The trial judge, after hearing the explanation for these transfers and the resolution said: "if it hadn't been for the explanation in Exhibits 34, 35 and 36, I believe are the ones—the last three resolutions—in any event, under which transfers were made, two of them subsequent to the Mallon decision, one on the day of the Mallon decision, if it hadn't been that I had been completely satisfied with the City's explanation of those three resolutions, that, coupled with their conduct following the Morse case, it would have probably led me to believe that they were in need of an injunction. . . ."

This points up two facts—that the trial judge accepted the city's explanation of its conduct and believed it acted in good faith; and that he was not unmindful of the city's questionable conduct between the Morse case and the Trickey case and appellant's claims that it had deliberately misappropriated trust funds. But considering the entire record the trial judge had this further to say: "I find little or nothing in the record of the conduct of the City of Long Beach since 1951 that is reprehensible. . . ."

Since the court heard the testimony of the witnesses, all city officials during the crucial periods, and had before it all of

the council resolutions bearing upon every transfer and expenditure charged, we feel it will serve no useful purpose to further recount the evidence. The issue of good faith was one of fact and was resolved in favor of respondents by the trial judge. In so doing, the lower court was performing its normal and proper function of weighing the evidence and determining the credibility of the witnesses. With the trial judge's determination of the good faith issue, and its finding thereon, this court will not interfere.

No complicated legal issues are here involved. Appellant in her accusations against the city (which mainly involve factual questions resolved by the trial judge) charges the trustee, among other things, with dealing with trust property for its own profit (using the funds for general municipal purposes), taking action adverse to the beneficiary without disclosure of its adverse interest, lobbying for the passage of the Act of 1951, commingling trust property with its own (as in the Trickey case), defrauding the beneficiary by interpreting the law favorable to its own interests, and "misappropriating trust funds." In support of these charges, she cites extensively from sections 2228-2236 of the Civil Code and authorities pointing up the obligations and duties of a trustee. In what manner the city conducted itself, why it did so, and if it had reasonable cause so to do, were questions of fact resolved by the lower court. The findings reflecting these determinations the reviewing court will not disturb.

▆ It is almost too well settled to require citation of authority that whether injunctive relief will be granted in a given case is a matter largely within the discretion of the trial court. (*Wholesale T. Dealers Bureau* v. *National etc. Co.*, 11 Cal.2d 634 [82 P.2d 3, 118 A.L.R. 486] ; *Phillips* v. *Isham*, 111 Cal.App.2d 537 [244 P.2d 716] ; *Smith* v. *Mendonsa*, 108 Cal.App.2d 540 [238 P.2d 1039] ; *People* v. *Black's Food Store*, 16 Cal.2d 59 [105 P.2d 361] ; *Brock* v. *Superior Court*, 11 Cal.2d 682 [81 P.2d 931].) ▆ The trial court not only based its holding that "no injunction is presently necessary" upon its findings of good faith on the part of the city in asserting its intention to abandon its prior conduct, and "because of the present conduct of the City of Long Beach, which I believe is beyond reproach"; but also upon the additional point "that for all practical purposes, the problem is already disposed of by the law of the case, in this very case that we now have before us, the Mallon decision, the Supreme Court decision of the Mallon case (April 5, 1955) ; we have

the legislative enactment (Act of 1956) authorizing the settlement of this problem; we not only have the People's case, but we have an injunction in the People's case . . .'' which the trial court classed under ''change of circumstances,'' all of which led the court to conclude that '' (T)here is no reasonable expectation or probability that the acts complained of . . . will be either repeated or continued . . . and no necessity for the granting of the injunctive relief prayed for herein now exists.''

Before discussing the general rule that equity acts in injunctive proceedings upon the situation, as it appears at the termination of litigation as distinguished from that at the time of or prior to the commencement of the action, recognized by the trial judge when he said: ''We are concerned with the present situation, and not with the prior situation,'' we refer briefly to the changed circumstances supported by the record and relied upon by the trial court.

At the outset of the instant litigation, the city in its answer emphatically declared its intention to continue to expend the funds in question for its general use. However, since then and before the trial on the merits, conditions arose, the effect of which was to foreclose defendants' further use of the money—in the form of a Supreme Court decision, a legislative enactment and a final stipulated judgment in an action between the city and state, settling once and for all in clear and unequivocal language the long dispute between them over the ownership of the funds accrued and accruing. In the face of this state of affairs, the city filed an amended answer saying in effect, ''We engaged in these activities up to now, we thought we were right; we were wrong; we will not do it again and we need no further court order to prevent us from doing it in the future.'' This ''change of circumstances'' resulting in the city's present attitude, supported by the record herein, completely warranted the exercise of the trial court's discretion in denying injunctive relief. Very briefly the change consisted of the following: After the city filed its answer in 1953 asserting its right to the money, the Supreme Court on April 5, 1955, advised defendants that the Act of 1951 operated to release to the state, not to the city, the funds it intended to use. To recover the revenues which accrued since 1951, and to accrue in the future, the state sued the city in September of 1955. To implement settlement of this case, the Act of 1956 was passed by the Legislature approving the rendition of a judgment completely and finally disposing

of all claims past, present and future. Pursuant to this act a stipulated judgment was entered in the People's case on September 11, 1956, completely settling all claims to 50 per cent of the revenues from gas and oil and all revenues from dry gas up to February 1, 1956, all future claims to those revenues accruing after January 31, 1956, ordering the city to account for and pay over monthly accrued revenues and declaring the city's rights to 50 per cent of oil and gas revenues remaining in the tidelands trust and directing their use only for trust purposes requiring an order of court for other uses. Pursuant to this order, the city on October 31, 1956, paid to the State of California a lump sum of $122,-339,133.89 in full settlement of all claims to the funds to February 1, 1956, started monthly payments to the state which it has continued to date and has not touched the remaining 50 per cent for a nontrust purpose.

By the time the instant case was tried an accounting had been had and all acts or omissions occurring prior to February 1, 1956, had been finally settled, all past controversy between the parties over the disputed funds had ended and the city had acceded to the legislative and judicial adjudication of its rights in and to the revenues in question. Long before trial the city found itself under judicial decree bound to use the very funds here in dispute in the same identical way urged by appellant. It has complied and we have no reason to believe it is not now still complying. Any protection the beneficiary may need is found in the mandatory judgment in the People's case to pay over to the state the monies as to which appellant sought an injunction preventing their use for municipal purposes, and the injunctive effect of the judgment as to the monies remaining in the so-called Long Beach tidelands trust. We can only conclude from the record that there was no necessity for what, in effect, would be a second injunction regulating the use of the disputed revenues.

In *Pacific Gas & Elec. Co.* v. *Minette*, 115 Cal.App.2d 698, at page 709 [252 P.2d 642], the court stated the general rule applicable to the facts of the case at bar: ''The appropriateness of injunction is to be determined as of the time of the order or judgment unless special circumstances otherwise require.'' This is based upon the theory that equity acts in the present and not in the past tense. ''It has been said that equity acts in the present tense, and that relief is dependent on present and future conditions rather than solely on those existing when the suit was brought.'' (43 C.J.S. § 29,

at p. 460; *American Fruit Growers* v. *Parker*, 22 Cal.2d 513 [140 P.2d 23].) A case of interest at this point is *Oliver* v. *City of Cincinnati*, 12 Ohio App. 432, 32 O.C.A. 533, involving a taxpayer's suit for injunctive relief to enjoin a proposed street railway franchise. The city appeared and admitted its intention to do that sought to be enjoined. The county prosecuting attorney then filed an ex rel. quo warranto proceeding in the name of the state wherein an injunction was issued enjoining the carrying out of the terms of the ordinance granting the franchise. Thereafter, the city filed an amended answer and denied it would attempt to proceed further. In refusing what in effect would be a second injunction, the Ohio Court of Appeals said:

"In the absence of exceptional circumstances, in equitable actions, the right to judgment or decree is not limited to the facts as they existed at the commencement of the action, but the relief administered is such as the nature of the case and the facts as they exist at the close of the litigation demand. An injunction will not be granted where at the time of the hearing conditions have so changed that no unlawful act is threatened. *Continental Securities Co.* v. *Interborough Rapid Transit Co.*, 207 Fed.Rep. 467; *Sherman* v. *Foster*, 158 N.Y. 587 [53 N.E. 504]; *Pond* v. *Harwood*, 139 N.Y. 111, 120 [34 N.E. 768]; *Peck* v. *Goodberlett*, 109 N.Y. 180 [16 N.E. 350]; *Union Bag & Paper Co.* v. *Allen Bros. Co.*, 107 N.Y.App. 529; *Hale* v. *Jenkins* [55 Misc. 119], 106 N.Y.Supp. 282; *Brown* v. *Cole*, 105 N.Y.Supp. 196; *Boone* v. *Von Arx*, 4 Alaska 716, and *Grand Trunk Ry. Co. of Canada* v. *Michigan Railway Commission*, 198 Fed.Rep. 1009, 1022. See note to *Alsager* v. *Peterson*, 31 S.D. 452 [141 N.W. 391], in 38 Ann. Cases, 1915D, and cases therein cited, and 16 Am. & Eng. Ency. Law, 431.

"In the case at bar, before this cause was presented to the court for decision, there was a binding judgment by the court of last resort determining that the agreements in question were void. It was between substantially the same parties as those in this case. Unlike the situation presented in *Davis* v. *Berry, supra*, there is no apprehension that the defendants will attempt to carry out the ordinance, the invalidity of which has been conclusively established and the performance of which has been prohibited. The city requires no further decree to protect its interest. To paraphrase the decision in *Continental Securities Co.* v. *Interborough Rapid Transit Co.*,

207 Fed.Rep. 467, 471, the obnoxious franchise is dead and the supreme court has written its epitaph. There is not even a moot question for determination by this court. The plaintiff is not entitled to a decree.'' (12 Ohio App. at pp. 437-438.)

■ Injunction ''is an extraordinary power, and is to be exercised always with great caution'' and the power rarely, if ever, should be exercised in a doubtful case. (*City & County of San Francisco* v. *Market St. Ry. Co.*, 95 Cal.App.2d 648, 655 [213 P.2d 780] ; *Schwartz* v. *Arata*, 45 Cal.App. 596 [188 P. 313].) ■ If, therefore, at the time of the order or judgment, in the absence of special circumstances, which are not here involved, there is no reasonable probability that past acts complained of will recur, injunctive relief will be denied. ■ Injunctive power is not used as punishment for past acts and is ordered against them only if there is evidence they will probably recur. (*Rosicrucian Fellowship* v. *Rosicrucian etc. Church*, 39 Cal.2d 121 [245 P.2d 481] ; *Hannah* v. *Pogue*, 23 Cal.2d 849 [147 P.2d 572].) ■ A court of equity will not afford an injunction to prevent in the future that which in good faith has been discontinued in the absence of any evidence that the acts are likely to be repeated in the future. (43 C.J.S. § 22, p. 445; *Thome* v. *Honcut Dredging Co.*, 43 Cal.App.2d 737 [111 P.2d 368].) In line with these general rules governing the issuance of an injunction are the cases of *Ratterree Land Co., Inc.* v. *Hutton*, 4 Cal.2d 100 [47 P.2d 732] and *Blackmore Investment Co.* v. *Johnson*, 213 Cal. 148 [1 P.2d 978], which hold that where events occur after the filing of the complaint which render an injunction unnecessary, it will ordinarily be refused.

A search of the record before us discloses nothing to indicate a probability of either a disposition of, or opportunity for, the city to in the future abandon its declared intention to abide by the legislative Act of 1956 and the court's judgment. Without such a probability an injunction is unnecessary.

For the foregoing reasons the exercise of the trial court's discretion in denying injunctive relief was warranted. No abuse thereof is apparent in the record and the judgment is affirmed.

White, P. J., and Fourt, J., concurred.