**NEW ENGLAND THEATRES, Inc., et al.**
**v. LAUSIER.**

No. 520.

United States District Court
D. Maine, S. D.

Oct. 25, 1949.
As Amended Oct. 29, 1949.

Franklin G. Hinckley, Portland, Maine, Arthur E. Whittemore, Boston, Mass., for plaintiffs.

Abraham M. Rudman, Bangor, Maine, for defendant.

CLIFFORD, District Judge.

This is a proceeding which seeks from this Court a declaration of rights and responsibilities existing under certain contracts entered into by the parties. The remedy requested is that set forth in Title 28 U.S.C.A. § 2201 (formerly 28 U.S.C.A. § 400), commonly known as the Declaratory Judgment Act.

■ Jurisdiction of this Court rests on two grounds. First, this proceeding concerns the application of the terms of a decree, United States v. Paramount Pictures, Inc., et al, D.C., 66 F.Supp. 323, as modified, D.C.S.D.N.Y.1946, 70 F.Supp. 53, issued by a United States Expediting District Court for the Southern District of New York, under a law of the United States, such law being known as the Sherman Act, 26 Stat. 209, as amended, 50 Stat. 693, 15 U.S.C.A. §§ 1 and 2. Second, this is also a proceeding in which the plaintiff New England Theatres, Inc. is a Delaware corporation, the plaintiff M & P Theatres Corporation is a Massachusetts corporation, and the defendant is an individual and a citizen of Maine, thus fulfilling the jurisdictional requirement of diversity of citizen-

854

ship. The matter in controversy exceeds the sum of $3,000.

■ This Court is of the opinion that its consideration of the present case involves no clash of jurisdiction with the United States Expediting Court for the Southern District of New York. The modified decree of the Expediting Court, United States v. Paramount Pictures, Inc., D.C., 70 F.Supp. 53, 76, includes the ruling that "jurisdiction of this cause is retained for the purpose of enabling any of the parties to the judgment, *and no others,* to apply to the court at any time for such orders or direction as may be necessary * * *." (Emphasis added.) The quoted words appear to leave it open for other federal courts, otherwise having jurisdiction, to decide questions arising under the decree, where persons are involved who were not parties to the original judgment. In the present case, the defendant was not a party to the original judgment. As will appear, plaintiffs are subsidiaries of Paramount Pictures, Inc., one of the defendants in the original action; but neither plaintiff was itself a party to that action. There is a question, which this Court need not now decide, whether these plaintiffs could have brought the present action for a declaratory judgment against the present defendant in the Expediting Court in New York. It is enough that the question exists. Plaintiff has applied to this forum instead, the only federal forum having jurisdiction of defendant. The decree of the Expediting Court supports an inference that other courts may deal with questions involving persons not parties to its original judgment. This Court will therefore refuse to decline jurisdiction of the present case on any ground of comity.

It appears by affidavits introduced by the plaintiffs, and not contradicted by the defendant, that all of the stock of the plaintiff New England Theatres, Inc. was at all times material to the issues herein owned by Paramount Pictures, Inc. and that at least 83⅓% of the stock of the plaintiff M & P Theatres Corporation was at all times material to the issues herein also owned by Paramount Pictures, Inc., through the latter's ownership of New England

Theatres, Inc. and Publix Netoco Theatres Corporation.

New England Theatres, Inc. is now and was in August, 1937, owner of the Central Theatre in Biddeford, Maine. Louis B. Lausier is now and was in August, 1937, the lessee of the City Theatre in Biddeford, Maine. On August 26, 1937, New England Theatres, Inc. and Lausier executed a written agreement which provided that the City Theatre and the Central Theatre should be operated as a unit and that profits, after certain deductions, should be shared between the two parties. A copy of this contract is incorporated in the complaint as Exhibit No. 1 and still governs the business relations between the parties to it. Pursuant to authority given in this contract, New England Theatres, Inc. entered into a contract with the plaintiff M & P Theatres Corporation under which the latter agreed to furnish management services for the City and Central Theatres for certain compensation. This contract is incorporated in the complaint as Exhibit 2, and is also still in effect.

The plaintiffs have brought this action for a declaration as to the continued validity of the above-mentioned agreements as the result of litigation between the United States Government and certain producers, distributors, and exhibitors of film, including Paramount Pictures, Inc., the parent of the plaintiff corporations. This litigation, started in 1938, proceeded before a special expediting court convened in the Southern District of New York, which issued an opinion and decree, U. S. v. Paramount Pictures, Inc., et al., D.C., 66 F.Supp. 323, as modified, D.C.S.D.N.Y.1946, 70 F.Supp. 53, enjoining the defendant from "* * * making or continuing to perform pooling agreements whereby given theatres of two or more exhibitors normally in competition are operated as a unit or whereby the business policies of such exhibitors are collectively determined by a joint committee or by one of the exhibitors, or whereby profits of the 'pooled' theatres are divided among the owners according to prearranged percentages." 70 F.Supp. at page 74.

Plaintiffs, in this Court, sought to bring about a final determination of the validity

of the contracts by means of a summary judgment. Hearing was had and briefs were filed. It was adjudged, as a result of the summary judgment proceeding that: "A pooling agreement exists between one of the plaintiffs and the defendant, whereby the theatres under their control are operated as a unit. Their policies are collectively determined, and profits are shared by a pre-arranged percentage."

However, the Court found that: "There appears a genuine issue as to whether such theatres would be 'normally in competition' in the absence of any pooling agreement, such issue being one of a material fact."

A full hearing has been held on the merits relating to this issue. Since the hearing, this Court has denied a motion by defendant that the case be dismissed for lack of jurisdiction of the parties and the subject matter; and, upon motion by plaintiffs, this Court has refused to permit defendant to obtain certain further evidence by means of a deposition.

The issue before this Court is a narrow one: Are the two Biddeford theatres, the City and the Central, "normally in competition" within the meaning of that phrase as used in the decree of the Expediting Court? United States v. Paramount Pictures, Inc., et al., D.C.S.D.N.Y. 1946, 66 F.Supp. 323, affirmed in part, reversed in part, 1947, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The plaintiffs contend that they are normally in competition; the defendant contends that they are not normally in competition.

A preliminary point must first be settled. As above set forth, the order on the plaintiffs' motion for summary judgment limited further litigation to the issue of competition. Notwithstanding this limitation of the scope of the controversy, and timely objection on the part of the plaintiffs, both plaintiffs and defendant have been heard concerning the further issue whether or not the defendant is an "exhibitor" within the meaning of that part of the decree enjoining pooling agreements.

Defendant has contended that he is not and has not been experienced in the business of exhibiting motion pictures; that he purchased the lease of the City Theatre only on the assumption that plaintiffs would undertake the active management of it; that he is merely an investor and not an operator or an exhibitor, and thus that the decree, which in terms applies to pooling agreements among exhibitors, should not be held to apply to the contracts at issue in this case.

■ As the plaintiff has pointed out in one of its briefs, the term "exhibitor" in the part of the decree pertinent to this case has a meaning different from the term "operator". The decree speaks of agreements whereby theatres of two or more exhibitors are operated as a unit, the implication being that one or more of the cooperating exhibitors may be wholly inactive in the management of the pool. Again, the concept of "exhibitor", insofar as the decree enjoining pooling agreements is concerned, is that of "theatre owner", as appears from the use of the two words, "exhibitors" and "owners", in conjunction in the following excerpt from the decree: " * * * theatres of two or more exhibitors, normally in competition, are operated as a unit or * * * whereby profits of the 'pooled' theatres are divided among the owners * * *." U. S. v. Paramount Pictures, Inc., 66 F.Supp. 323, at page 358.

It may also be observed that the Supreme Court, in softening the effect of the lower court's decree, by exempting from its operation cases which "involve no more than innocent investments by those who are not actual or potential operators", U. S. v. Paramount Pictures, Inc., 1947, 334 U.S. 131, 153, 68 S.Ct. 915, 927, 92 L.Ed. 1260, was referring to cases of joint ownership and not specifically to cases involving pooling agreements between theatres separately owned.

■ While these observations might not be conclusive, this Court is of the opinion that the defendant, on the evidence, is not merely an investor but is an exhibitor within the meaning of the decree relating to pooling agreements.

Defendant purchased the lease of the City Theatre from an earlier lessee, who

had been a party to agreements with plaintiffs like those under consideration. The existence of such agreements may have been the basis for defendant's assumption that he, likewise, might be able to enter such an arrangement with the plaintiffs. On the evidence, however, this Court finds that defendant had procured a twenty year lease to the City Theatre, to run from the expiration of the earlier lease, at least three months before he had any discussion with the plaintiffs concerning the present agreement between them (Record, pp. 141–142, 152–153), and six months before conclusion of the present agreement and purchase by defendant of the unexpired term of the earlier lease. It follows that defendant when he first took a lease had no assurance that plaintiffs would in fact conclude an agreement with him to operate the theatre, and that he therefore initially undertook all the risks of an operator. This being so, it is unnecessary to determine whether, as the pool was actually operated, defendant exercised or had the right to exercise his judgment in management decisions.

For the above reasons, defendant's first argument fails, and he is subject to the injunction of the New York decree if the two theatres would be, in the absence of the existing contracts, "normally in competition."

The evidence presented by the parties on the question of competition has been full and complete. On the basis of the evidence this Court finds that the City Theatre is an old fashioned hall, located on the second floor of the City Building, owned by the City of Biddeford, and was constructed over fifty years ago. The City Theatre is poorly appointed, having a drab and dingy entrance, lobby and rest rooms, with most of its auditorium seats on the flat floor and many of its side seats giving a distorted view of the screen. Some of the seats have been broken and patched. Very little money has been expended on its maintenance. In short, as one witness, experienced in the motion picture business, characterized the City Theatre, " * * * in the parlance of our industry, I would call that a shooting gallery." (Record, p. 39). The City Theatre has for a number of years, under the combined management, shown first-run pictures of the so-called "B" or "action" variety, and has charged lower admission prices than has the Central.

The Central Theatre, on the other hand, located within a few blocks of the City Theatre, is a completely modern street-level theatre, was newly constructed within the past several years, with new appointments throughout, and offering a good view of the screen from all seats. Under the combined management the Central has consistently shown the first-run of the top grade or "A" type pictures, and has charged higher admission prices than those of the City. The evidence is undisputed that the combined gross income of the two theatres has come roughly 70% from the Central and roughly 30% from the City.

■ The phrase "normally in competition" is understood by this Court to refer to the competitive situation which would exist between the theatres apart from the peculiar circumstances of a combined management, or pooling, agreement. The Court has been unable to find precedent to guide it in the exact application of the phrase to a situation like that now before it. Testimony by persons familiar with theatre management and with the circumstances obtaining in Biddeford has been conflicting as to whether, and in what manner, the City Theatre could compete successfully with Central if the combined management agreements are dissolved. There seems to be little question that Central would be able to compete successfully with City should the combined management agreement be dissolved, and that dissolution of the agreements would enure to the substantial benefit of Central, the plaintiffs' theatre.

What is meant by "competition"? Competition is defined in Lipson v. Socony-Vacuum Corporation, 1 Cir., 1937, 87 F. 2d 265, 270 as "the struggle between rivals for the same trade at the same time; the act of seeking or endeavoring to gain what another is endeavoring to gain at the same time." True, it has been said that "if methods become too widely separated,

competition usually disappears, because the superiority of one must be admitted. Competition between sail and steam may still exist as to freight, but there is none as to passenger traffic", Continental Securities Co. v. Interborough Rapid Transit Co., D.C., S.D., N.Y.1913, 207 F. 467, 470; but we are not dealing with a case of competition analogous to that between sail and steam. Rather our case is one of the competition between a new steam passenger vessel and one forty or fifty years old. This Court is unwilling to state as a matter of law that there is no competition in the latter case.

The testimony in the present case included an undisputed estimate that the overlap of persons who might be inclined to patronize either theatre at any given time is in the neighborhood of twenty-five percent; that is, that this proportion of the patrons of one theatre might be drawn to a given performance of the other. This estimate, although perhaps on the liberal side and not acceptable as a precise conclusion, nevertheless is probably within the range of reason. It is reasonable also to suppose that an exceptional film at either theatre might draw a far larger proportion of the patrons of the other. Certainly this would be true of an exceptional film showing at the Central.

If the present management agreement is terminated by this Court, the future of the City Theatre holds one of two possibilities. It may compete or it may close. Both theatres would be attempting to make a profit from the showing of motion pictures to an audience that might overlap to some degree. Each would attempt to get the best pictures it could afford and draw a larger percentage of the money being spent in Biddeford for amusement. Certainly with its present antiquated facilities City would labor under a substantial handicap and yield a gross income far below that yielded by Central. This discrepancy in gross income would inevitably tend to limit the effectiveness of City's bidding for the better pictures, both because of its lower purchasing power and because the distributors of pictures prefer to rent their better films to theatres showing the higher records of box office income.

As indicated by the evidence, a modernization of City's facilities might cost upwards of $25,000. But even were this modernization program undertaken, City would still have the permanent handicap of its second floor location. And it must be noted by the way that City is located in leased quarters, the lease having less than ten years to run, though subject to renewal for a further twenty-year period. An investment in modernizing City might be forfeited in any event upon expiration of the lease, or of the renewal thereof; and it is possible that the lessor, being a city government, may have the power to terminate the lease at an earlier date, both possibilities rendering such an investment highly speculative.

The second possibility for the future of City must therefore be faced, namely, that it will be unable to make a profit and to survive at all under independent management. Its present thirty percent of the gross theatre income in Biddeford may be insufficient to keep it going. It will have difficulty in retaining a skilled manager, such persons preferring to associate themselves with newer theatres. These facts coupled with the risk of undertaking a modernization program, may well be enough to prevent any effective steps being taken to salvage the City Theatre. Thus it is entirely possible that dissolving the agreement may not in fact lead to competition, but may instead reduce to one the number of motion picture exhibitors in Biddeford, affording Biddeford actually less service than it has at present.

The plaintiff has demonstrated that the defendant, Mr. Lausier, is an able lawyer and business man of many interests; that he is the president of a bank and that he has an intimate knowledge of the people of Biddeford and has served his city with distinction and rare ability for many years as Mayor. While this Court is in accord with the assertions made by the plaintiffs concerning Mr. Lausier's background, experience and ability, yet in the opinion of this Court it is problematical whether he

would be qualified to manage the City Theatre independently. The objective facts in the case indicate that these personal considerations will be insufficient to overcome the real handicaps which will face the management of the City Theatre upon termination of the present agreement.

▇ Although this Court has attempted to point up the existing disparity in the physical properties of those two theatres, operating under a pooling agreement and single management, yet in deciding the question whether or not they would be "normally in competition" the important factor is in the opinion of this Court the relative location of the two theatres. It finds, as a matter of law, that two motion picture theatres, operating in close proximity to each other, in other words, within the same competitive area, are "normally in competition", within the meaning of the decree in the Paramount case, notwithstanding the wide disparity in the physical attributes of the theatres and in the type of moving pictures they offer. This Court finds that motion picture houses in a single business area, as are those in the present case, are necessarily competing for the consumer's entertainment dollar. The fact that that product offered by one competitor is so poor that the competitor might not survive in the absence of a pooling agreement is not pertinent to the discussion. It has always been one of the elements of true competition that consumers may find the product of one competitor so lacking to their taste that they will turn elsewhere and force that competitor out of business.

The theatres of plaintiff and defendant being "normally in competition", it follows, and this Court declares, that the agreements here in issue are governed by the decree of the Expediting Court against Paramount Pictures, Inc., and must be terminated as hereinafter provided.

\*    \*    \*    \*    \*    \*

It has been brought to the attention of this Court by the parties hereto that, subsequent to the bringing of this proceeding, a consent decree in the New York anti-trust proceeding, agreed upon by counsel for the United States and for Paramount Pictures, Inc., was entered by the Expediting Court on March, 4, 1949.[1]

\*    \*    \*    \*    \*    \*

This consent decree spells out in considerable detail exactly what Paramount must do to conform to the various provisions of the earlier New York decrees. Separate provisions are made in the consent decree for restoring competition with reference to each of several classifications of theatres. As to those theatres owned or operated jointly with potential independent exhibitors, the consent decree provides with certain specified exceptions that such joint arrangements shall be terminated for one third of the theatres within one year from the date of the decree, for a second third within two years from the date of the decree, and for all within three years from the date of the decree. As to sixteen theatres in five communities, owned jointly with persons who are solely investors, the consent decree provides that such joint arrangements must be discontinued as to one or more of the theatres in each of the five communities within two years after the date of the decree. Finally, Paramount is required by the consent decree to dispose of certain theatres wholly owned by it, within two years after the date of the decree.

Doubtless the years of grace were allowed by the Expediting Court in each case, in order to make certain that the impact of its decision would not offend "the traditional notions of fair play and substantial justice", See Holmes, J. in McDonald v. Mabee, 1917, 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608, L.R.A.1917F, 458, by requiring a wholesale revision of Paramount's business practices to be undertaken overnight.

▇ This Court has considered the probable effects of the impact of this decision on the defendant, the consideration

---

1. For a further discussion of the relationship of the consent decree to the case at bar, see opinion of this Court on plaintiff's motion that defendant's proposed deposition be not taken, entered October 20, 1949.

shown by the Department of Justice in its approval of the terms of the consent decree, and the fair attitude of Paramount in regard to the defendant, as expressed by its counsel in the presentation of this case. This Court rules that the parties hereto shall be allowed a period of two years from the date of the order filed pursuant to this opinion, to terminate the agreements here in issue, unless the parties mutually agree to terminate the agreements at an earlier date; that these agreements shall be legally binding on the parties and performance thereof shall not be deemed in violation of the decree of the Expediting Court for the Southern District of New York, during such two year period; and that the agreements shall be terminated, in any event, at the expiration of such two year period.

The case will be retained on the docket for determination by a master of the amounts due from each party to the other upon termination of the agreements, in the event that the parties are unable to agree among themselves upon a settlement of their respective claims.

An order may be submitted in accordance with this Opinion, said order to contain the provision, "without costs to either party."