**BOLICK–GILLMAN COMPANY, a Nevada Corporation, Plaintiff,**

v.

**CONTINENTAL BAKING COMPANY, a Delaware Corporation, Defendant.**

**Civ. No. 281.**

United States District Court
D. Nevada.

Dec. 28, 1961.

Morton Galane, Las Vegas, Nev., for plaintiff.

G. William Coulthard, Las Vegas, Nev., and Stapleton, Weinberg & Isen, Beverly Hills, Cal., for defendant.

ROSS, Chief Judge.

We are faced with a second amended complaint which seeks damages against defendant under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, by reason of an alleged violation of Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a).

Plaintiff alleges, in essence, that it was a wholesale distributor of bread in the Las Vegas, Nevada, area for an Arizona manufacturer; that defendant, who was a Utah manufacturer of bread, made use of an exclusive distributor in the Las Vegas, Nevada, area who was in competition with plaintiff; that defendant charged prices to its Las Vegas distributor which were lower than those charged to its distributors elsewhere; and that, as a result of such alleged price discrimination, plaintiff was injured.

The question is whether plaintiff is within the scope of those statutes which make certain types of conduct illegal and give to certain persons the right to

recover damages which result from such conduct.[1]

We note, initially, that although Section 4 of the Clayton Act states, in relevant part, that "any person who shall be injured * * * may sue," the Courts have not seen fit to read that provision literally.[2] Thus, even though injured by reason of violation of the antitrust laws, certain persons have been held unable to maintain private damage suits. Among such persons are shareholders, officers of corporations, creditors and landlords. See Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 363 (9th Cir., 1955) (citing cases).

Before we may determine what given persons may sue to redress alleged violations of the Robinson-Patman Act, we think it advisable to consider the nature and object of that Act. If we may understand what the Act was trying to accomplish, we may better understand what persons may ultilize it via a private suit for treble damages. Accordingly, we cannot place undue reliance on those cases which are replete with intriguing generalities as to the full breadth of the antitrust laws, but which did not concern enforcement of rights resulting from alleged violations of the Act here in question.[3]

One of the purposes of the Robinson-Patman Act is to protect so-called "primary-line competition." F. T. C. v. Anheuser-Busch, Inc., 363 U.S. 536, 545, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). The concept of primary-line competition is derived from that portion of the statute which speaks of "competition with any person who * * * grants" a discriminatory price. In deciding, once and for all, that the Act protects primary-line competition, i. e., competition with the grantor of the allegedly discriminatory price, Thumann, Territorial Discrimination, Robinson-Patman, and a Rule of Reasonable Probability, 8 U.C.L.A. L.

---

1. A reading of the opinion rendered by the Court of Appeals which reversed this Court's dismissal of a prior complaint indicates that the Court of Appeals did not consider the issue which is now, for the first time, squarely raised. Although it is true that plaintiff argued matters in its appellate brief which were similar to those advanced here, there is no indication that the Court of Appeals relied on them in reaching its decision. However, plaintiff argues that since the Court of Appeals was aware of the relationship between plaintiff and defendant, "it may be inferred that if standing to sue did not exist as a matter of law, the Court would not have remanded the case." We cannot accept that line of argument, for this is not the first time that an issue has existed but not been met by a court faced with determining the scope of the Robinson-Patman Act. Compare Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954) (where the Court sustained recovery in a case which was predicated on violations of both sec. 2(a) and sec. 3 of the Act, 15 U.S.C.A. §§ 13(a), 14) with Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958) (where the Court held that a private cause of action does not arise for a violation of sec. 3 as such). Plaintiff's arguments to the appellate court were not patently directed to the narrow issue with which we deal herein. Hence, the fact that the Court of Appeals did not treat the instant matter is quite understandable.

2. The following quotations are representative of the approach which has been developed by the courts when dealing with private damage suits.

"Those harmed only incidentally by antitrust violations have no standing to sue for treble damages * * *." Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678, 679 (2d Cir., 1955), cert. den. 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

"Injury which is merely a collateral effect of illegal restraint upon competition is not compensable under the anti-trust laws. Those who suffer such injury are not injured 'by reason of' antitrust violations within the purport of the statute." Rossi v. McCloskey & Co., 149 F.Supp. 638, 640 (E.D.Pa., 1957).

3. Our attention has been especially directed to Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir., 1955), where the Court, at page 365 of its opinion, referred to the "broad scope of the antitrust laws." That was an action brought for the alleged violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, and Section 3 of the Clayton Act, 15 U.S.C.A. § 14. Our reasons for holding that case to be inapposite to the case at bar are set forth in footnote 7 infra.

Rev. 363, 366 (1961), the Supreme Court in Anheuser-Busch, supra, spoke of the goal of Section 2(a) "to extend protection to *competitors* of the discriminating seller * * *." 363 U.S. at 546, 80 S. Ct. at 1272, emphasis added. Although the legislative history is not as helpful as it might be, we are satisfied that the expressions of congressional intent which do exist [4] are entirely consistent with the inference which we draw from the statute and from the passage which we have just quoted from Anheuser-Busch; to wit, that a plaintiff, when suing to enforce the Act on a theory of injury to primary-line competition, must allege and prove that it was in competition with the defendant. We are aware of no cases, and plaintiff has cited none, which have allowed a person to sue on a theory of injury to primary-line competition who was not, himself, a competitor of the alleged wrongdoer.

This is not to say, however, that a person who is not a competitor of the grantor of a discriminatory price has no recourse against the wrongdoer. Another purpose of the Act is to protect so-called "secondary-line competition." George Van Camp & Sons Co., v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 31 (1929). Here, we are typically dealing with a case in which one of two buyers of the same seller is injured in the competition for the resale of goods because the other buyer obtains his goods from the seller at a more favorable price. Thumann, op. cit. supra, at 366. We have no doubt but that the essence of a secondary-line case is the injury to competing buyers from the same seller. See F. T. C. v. Morton Salt Co., 334 U.S. 37, 45 et seq., 68 S.Ct. 822, 92 L.Ed. 1196 (1948), where there are repeated phrases such as "competitive injury between a seller's customers." Accordingly, we are satisfied that a plaintiff, when suing to enforce the Act on a theory of injury to secondary-line competition, must allege and show that he was a purchaser from the defendant and that he was in competition with one or all of the favored dealers. See Youngson v. Tidewater Oil Co., 166 F.Supp. 146, 147 (D.Ore., 1958); Alexander v. Texas Co., 149 F.Supp. 37, 41 (W.D.La., 1957); Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541, 543 (E.D.N.Y., 1957). Compare Klein v. Lionel Corp., 237 F.2d 13, 14–15 (3rd Cir., 1956).

In light of the congressional history of the Act and in light of the gloss which has been placed upon the statute by the courts, we are of the opinion that, in a primary-line case, only a competitor of the defendant is entitled to the windfall of treble damages, and that, in a secondary-line case, only a customer of the defendant may bring suit.

We assume that plaintiff has not approached this litigation on the theory that this is a secondary-line case. Nowhere is there an allegation that plaintiff was a purchaser from the defendant. At no time has plaintiff argued that it should be allowed to present proof that it was.

However, it appears from plaintiff's memorandum that it now desires to prosecute this case on the theory that we are dealing with an injury to primary-line competition and that plaintiff was a competitor of the defendant. Or, at least it is plaintiff's position that it should be entitled to present evidence as to "the competitive rivalry between plaintiff and defendant which did in fact exist in the Las Vegas, Nevada, market with respect to *product*, as distinguished from competition as to price charged directly to customers." Thus, plaintiff would have

---

4. The following statement is to be found in H.R.Rep. No. 627, 63rd Cong., 2nd Sess., 8:

"Section 2 of the bill * * * is expressly designed with the view of correcting and forbidding a common and widespread unfair trade practice whereby certain [businesses] * * * have heretofore endeavored to destroy competition and render unprofitable the business of *competitors* by selling their goods, wares, and merchandise at a less price in the particular communities where *their rivals* are engaged in business than at other places throughout the country * * *." (Emphasis added).

us hold that he should be allowed to prove that, in addition to being in competition with defendant's independent distributor, he was in competition with the defendant as well.

There is no doubt, of course, but that the concept of "competition" may be read sufficiently broadly so as to include the rivalry between a manufacturer and a non-customer wholesaler of competing products for the purchases of the retailers who do business in the area where both the manufacturer and the wholesaler operate. Thus, there would be competition between a manufacturer and a wholesaler if both sold directly to the same retailer. See Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir., 1957), cert. den. 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); but see Rice v. Asheville Ice Co., 204 N.C. 768, 169 S.E. 707 (1933) (holding that plaintiff retail ice dealer is not a competitor of defendant ice manufacturers who sold both wholesale and retail). True, even if the manufacturer did not sell to retailers, it no doubt would be interested in the outcome of the rivalry between the wholesaler and its own independent distributor. This, for the reason that every sales dollar received by the wholesaler presumably is one less dollar for the manufacturer's distributor, and if the pattern were maintained for a sufficiently long period of time, the manufacturer might find himself unable to sell to his own distributor with the profit to which it had been, or to which it would like to become, accustomed. But, although such refined concepts of competition may be meaningful to a theoretical economist, that does not mean that they are relevant to a court which must determine whether Congress may fairly be said to have intended that one businessman should be able to recover treble damages from another.[5]

We realize that whether plaintiff and defendant were in competition with each other is a question which cannot be resolved by reference to mere categories or labels. Cf., United States v. McKesson & Robbins, Inc., 351 U.S. 305, 313, 76 S. Ct. 937, 100 L.Ed. 1209 (1956) (construing the Miller-Tydings and McGuire Acts, 15 U.S.C.A. §§ 1, 45). This rule accounts for the holding in the Esso Standard Oil Co. case, supra, where the court found the parties to be in competition with each other even though one was denominated in common parlance a "manufacturer," while the other was called a "wholesaler."

However, we are satisfied that, for purposes of the Robinson-Patman Act, even if we lay labels and ordinary functions to the side, there can be no competition unless plaintiff and defendant are selling to the same customers; i. e., they must be operating in the same market. See Brooks, Injury to Competition Under the Robinson-Patman Act, 109 Univ. of Pa.L.Rev. 777, 802 (1961) ("Early enforcement of the Robinson-Patman Act indicated that competition is considered as involving two or more independent firms actively attempting the sale of the same kind of merchandise to *the same prospective customers * * *.*"). The case law, although admittedly not involving Robinson-Patman litigation, has evolved a definition of "competition" which is in conformity with the one we

---

5. For example, if we were to view the term "competition" as does the academician in a university department of economics, we would have to say, at minimum, that every seller of a given commodity is in competition with every other seller of reasonably close substitutes. Thus, the seller of bread is, in theory in competition with all sellers of bread substitutes, such as potatoes, spaghetti and macaroni. We need say nothing more than that we are confident that the draftsmen of the Robinson-Patman Act did not intend to give to Chef Boyardee a right to recover treble damages from the makers of "Wonder Bread" for having engaged in territorial price discrimination. cf., Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 612, 73 S.Ct. 872, 97 L.Ed. 1277 note 31 (1953) ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range.").

156

adopt.[6] This is not to say that our definition or conception would apply to a situation where a defendant-manufacturer made use of, as a distributor, a wholly-owned subsidiary which in fact and law was nothing other than an alter

6. In Lipson v. Socony Vacuum Corp., 87 F.2d 265, 270 (1st Cir., 1937), cert. dismissed 301 U.S. 711, 57 S.Ct. 788, 81 L. Ed. 1364 (1937), "competition" was defined as follows: " 'The effort of two or more parties, acting independently, *to secure the custom of a third party* by the offer of the most favorable terms.' [citation omitted] 'The struggle between rivals *for the same trade* at the same time.' * * *" (Empasis supplied).

This definition was followed in New England Theatres, Inc. v. Lausier, 86 F.Supp. 852, 856 (D.Me., 1949), and the last sentence of the definition in Lipson was also used in United States v. Sutherland, 9 F.Supp. 204, 205 (W.D.Mo., 1934).

See Continental Securities Co. v. Interborough Rapid Transit Co., 207 F. 467, 470 (S.D.N.Y., 1913), affirmed 221 F. 44 (2nd Cir., 1915): "Competitors are *persons endeavoring to do the same thing* and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than its rival. *Unity of object* with diversity of method is the essence of competition * * *." (Emphasis added).

And see Hoenig v. Huntington National Bank, 59 F.2d 479, 483 (6th Cir., 1932), cert. den. 287 U.S. 648, 53 S.Ct. 93, 77 L.Ed. 560 (1932), where the court stated that "competition requires a *similarity in the nature of the transaction* * * *." (Emphasis added).

The Supreme Court has not given us a definitive definition of "competition." It is possible, however, to read F. T. C. v. Raladam Co., 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931), as distinguishing between merely being engaged in the same trade and being in competition. "Unfair trade methods are not per se unfair methods of competition. It is obvious that the word 'competition' imports the existence of present or potential competitors * * *."

Significantly, in one of the leading antitrust cases, the Supreme Court had to determine whether two manufacturers were in competition with each other, and in holding that they were not, the Court focused on the identity of the persons to whom each manufacturer sold its goods. See International Shoe Co. v. F. T. C., 280 U.S. 291, 295–297, 50 S.Ct. 89, 74 L.Ed. 431 (1930), where the Court observed:

"It is true that both companies were engaged in selling dress shoes to customers for resale within the limits of several of the same states; but the markets reached by the two companies within these states, with slight exceptions hereafter mentioned, were not the same. * * * * The trade policies of the two companies so differed that the McElwain Company generally secured the trade of wholesalers and large retailers; while the International obtained the trade of dealers in the small communities. * * * * "* * * * Thus it appears that in respect of 95 per cent. of the business there was *no competition in fact and no contest, or observed tendency to contest, in the market for the same purchasers* * * *." (Emphasis added).

See also Esso Standard Oil Co. v. Secatore's Inc., supra, 246 F.2d at 19–21, where the court held that a manufacturer and a distributor were in competition with each other. The finding seemed clearly to hinge on the fact that "each in its own way is striving for the business of supplying gasoline *directly* to those who operate fleets of motor vehicles." (Emphasis added). There, the court rejected the manufacturer's attempt to put stress on the notion of "function" and to distinguish between "competition in rendering the same service *from competition for the same customers.*" (Emphasis added). Thus, although the court found that "their competitive techniques are different, one gives less service for a lower price and the other more service for a higher price," the crucial fact was that each was attempting *directly* to sell to the *same group* of prospective purchasers.

Compare the following statement in Brooks, op. cit. supra, at 802: "While 'competition' has many different meanings, and there are many different types, the term 'always denotes *the presence in a specific market of two or more sellers and two or more buyers* of a definite commodity, each seller acting independently of every other seller and each buyer independently of every other buyer.'" (Quoting from Wilcox, Competition and Monopoly in American Industry 1, TNEC MONOGRAPH No. 21, 1940). In the case at bar the "specific market" may be either the market in which wholesalers buy (in which case plaintiff did not sell therein), or the market in which retailers, hotels and clubs buy (in which case defendant did not sell therein).

ego. In such a situation we might be constrained to rely on a conduit theory. We believe, however, that such treatment is not justified in a case, such as here, where the party actually competing with plaintiff is, as to the defendant-manufacturer, only an independent contractor.

The reason for our differentiation is simple: as long as the actual competitor of plaintiff is an entity which is independent of the manufacturer-defendant, there is no necessary assurance that a price discrimination will be translated into its distributor's lowering its prices so as to be able to compete more effectively with the plaintiff.

In the first place, if the defendant-manufacturer does not have legal control over its distributor, as in the case of a wholly owned subsidiary which acts as a mere alter ego of the defendant, the manufacturer may find itself in a position where its distributor, if satisfied with its own present market position, would merely enjoy its newly lowered costs, but not do anything which in any way would have an effect on competition with plaintiff or its other competitors. Of course, the distributor often will take advantage of its having received a discriminatory price and will lower its resale prices or increase its distribution outlay so as to improve its competitive position. But, since we are in a society which generally recognizes independent business organizations as being separate legal entities, we must view any such decision as being that of the distributor and we should not, in the absence of a clear congressional purpose, conclude that a manufacturer is in competition with a competitor of its independent distributor unless there is some measure of legal control exercised by the manufacturer over its distributor.

If firm A is to be in competition with firm B, we should think that firm A must be in a position where, within the limits imposed by business realities, it can immediately respond to the actions of firm B. Given a situation where the manufacturer has no legal control over its distributor, it cannot, in law, be said to enjoy such a position. To be sure, the manufacturer might be successful in an attempt to cajole or pressure its independent distributor into doing its bidding, but any decision to engage in more effective competition must be attributable to the distributor who, in law, had a choice. It may be argued that, as a matter of economic reality, the distributor will not have a choice, for it will inevitably face the threat of losing its source of supply. However, this overlooks the fact that the manufacturer may not be able to exert that type of coercion for fear that it will not be able to secure an alternative distributor who would sway with every breeze from the manufacturer's head office and, at the same time, be sufficiently well organized to be capable of undertaking the responsibilities of a distributorship. This leads us to our second reason why we may not view a manufacturer and an independent distributor as being "one" for determining whether plaintiff is in competition with defendant.

The fact is that if the distributor is legally independent of the manufacturer, the latter could not legally fix the price at which the distributor would resell its goods. Since the manufacturer would not subserve its purpose merely by having its distributor enter into a contract specifying *minimum* resale prices, in which case the manufacturer might be able to come within the provisions of the Miller-Tydings and McGuire Acts, he would have to fix *maximum* resale prices. Such conduct would be a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

In addition to these reasons for drawing a distinction between a manufacturer and its independent distributor, it should be remembered that both may compete for the same customers and that the manufacturer might discriminate in price as between its various independent distributors. We believe that a distribu-

tor who may find itself in competition with its supplier or who may be discriminated against by its supplier must be recognized as being an entity separate and distinct from its supplier.

■ In short, we are of the opinion that, in a primary-line Robinson-Patman case, a defendant manufacturer cannot be sued by a mere competitor of the defendant's independent distributor,[7] unless there is an allegation that plaintiff is in competition with defendant, and we are of the further opinion that such an allegation, even if found in a complaint, could not be proved, for the evidence would have to show that the defendant could, at will, cause its independent distributor to lower its resale prices so as to be able to take competitive advantage of its discriminatorily low costs. Bearing in mind that we are concerned with that separate legal entity known as an

---

7. Plaintiff has placed great reliance upon Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir., 1955), which, as we have mentioned did not arise under the Robinson-Patman Act, but which was concerned with alleged violations of Sherman Act, sec. 1 and Clayton Act, sec. 3. It was alleged that defendant, a major oil company, entered into exclusive dealing contracts with its retail service stations, whereby said stations were prohibited from handling certain automotive accessories, including car polishes, which were not "sponsored" by defendant. The sponsored products were not manufactured by defendant, but the distribution thereof to the service stations was either handled by or arranged for by defendant, who itself (or through a so-called TBA distributor) placed the orders with the various manufacturers. Plaintiff was a manufacturer of a car polish which was not "sponsored" by defendant. The question before the Court was whether plaintiff, as distinguished from its independent distributors, had standing to sue for damages allegedly incurred by reason of the defendant's practices.

Although explicitly refraining from passing on the question of whether the plaintiff's independent distributors had standing, the Court assumed, in a dictum, that they did. The Court then went on to hold that the manufacturer-plaintiff had standing as well. 221 F.2d at 364–365.

The reasoning of the Court was clear: "To say to a manufacturer of wax that he may have the protection of the anti-trust laws in private litigation if he hires salesmen for his product, and not have such protection if he decides to contract with a distributor, would appear to be an unequal application of the law and unjustified dictation as to how he operated his business. We are required to interpret congressional enactments in a manner consistent with their constitutionality, if possible." 221 F.2d at 364–365.

This approach is quite logical. When A and B contract that B cannot deal in the goods manufactured by C and distributed by D, A has the power, until the courts intervene, to deprive C and D of the revenues that they might have but for the contract between A and B. The effect on C and D is identical. D is the direct loser of sales. (Hence, it is not surprising that the Court assumed that the independent distributor had standing to sue). But, C is a direct loser also, or at least we may say that the loss is sufficiently direct so that grave constitutional problems might arise if we say that C's rights will depend upon whether it has chosen to deal with B directly or interposed D.

But, it would be error, we think to read Karseal as saying that in all situations C and D have equal rights as against A. Thus, in our example, C and D were injured because A made it legally impossible for B to purchase the products in which C and D were interested. In the case at bar, however, we have a different situation. It is true that a manufacturer of bread may find it impossible to sell to defendant's distributor because of the fact that defendant has favored its distributor with a discriminatorily low price. Such a situation, we learn from Anheuser-Busch, is chargeable to defendant. However, whether plaintiff finds that its trade is limited or restrained is a matter which, we have pointed out, is properly chargeable only to the defendant's distributor. If he wants to take advantage of the discriminatorily low price which he has received from defendant, he may be able to undersell plaintiff. But, that is not a matter over which defendant has any legal control. By contrast, in the case of the exclusive dealing contract between A and B, it was A who made it legally impossible for C and D to sell their goods.

In short, since the realities of Karseal are distinguishable from those which exist in the case at bar, we find that opinion inapposite.

independent distributor, plaintiff would have to prove its case by showing either that defendant could coerce its distributor when it wanted to or that defendant had, in fact, succeeded in fixing its distributor's resale prices.

We are of the opinion that it would be impossible for plaintiff to prove that defendant could exercise the requisite control absent proof that defendant had actually fixed its distributor's resale prices. This is because there would have to be proof, as we have indicated, that defendant had an alternative distributor who would be both inveterately subject to coercion and be capable of competently distributing defendant's goods. Such a fact is incapable of proof. At the same time, plaintiff has, in its formal statement of June 30, 1961, abandoned any contention that this particular defendant fixed the resale prices of its distributor.

Plaintiff has argued that defendant was in competition with it as to product, as distinguished from price. What he means is only conjectural. We assume that, in effect, he is arguing that both plaintiff and defendant sell bread and that since a given group of persons ultimately consume bread, it makes no difference that they sell at different prices. Of course, we recognize that two persons who sell in the same market need not necessarily compete as to price. This would be true, for example, if the products were substantially differentiated. However, plaintiff's argument has overlooked the fact that the litigants are not sellers in the same market, and for that reason we cannot accept it.

Interestingly enough, this is the first time that plaintiff has taken the position that it is in competition with defendant. In its second amended complaint, paragraph ten, plaintiff speaks of defendant's distributor as being "in competition with plaintiff." The pretrial memorandum makes frequent use of the same or similar phrases. Nowhere is there even a hint that plaintiff was felt to be in competition with the defendant, as distinguished from its independent distributor. Even more important is the position which plaintiff has taken with respect to defendant's assertion of the so-called section 2(b) defense.[8] In support of its motion to strike that defense from defendant's answer, plaintiff took the position that "the defense is limited to a seller who endeavors to meet his *own* competition, not that of the seller's Las Vegas distributor." Plaintiff then went on to say that "the predicate for the distinction [between meeting one's own competition and the competition of its distributor] is the simple fact that the exclusive distributor in a particular market is still an *independent dealer* and not a mere conduit to be controlled by the manufacturer. The manufacturer sells to many such distributors. Their goals are independent of the manufacturer." Plaintiff then pointed out reasons why we should recognize the manufacturer and its distributor as being separate entities for the purpose of determining with whom plaintiff was in competition.[9] The analysis, we believe, was and is sound.

Plaintiff, because of an understandable desire to have the best of all possible

---

8. Section 2(b) of the Act, 15 U.S.C.A. § 13(b), provides:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination; *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-

facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a *competitor*, or the services or facilities furnished by a *competitor*." (Emphasis added).

9. Plaintiff argued as follows: 1) the "manufacturer has *no right* to fix their resale price (except to the extent that a resale price agreement is protected by the McGuire Act);" 2) "a channel concept of distribution implies that the manufacturer has a dominant interest in the

worlds, then argues that this Court should take the position that plaintiff and defendant are in competition for purposes of determining whether plaintiff may sue, but are not in competition for purposes of determining whether the defendant may raise the statutory defense to such a suit. The obvious inconsistency between these two propositions is reconciled, says plaintiff, by the rules that we must liberally interpret the statutes giving a right to sue, citing Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), but must strictly construe section 2(b), citing F. T. C. v. Simplicity Pattern Co., Inc., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959).[10]

■ Rules of construction or interpretation are, of course, helpful. However, rules of construction should not be exalted to a point where they would draw distinctions which, as far as the evidence of legislative history is concerned, were never intended by the Congress. In short, we cannot conclude, in light of the plain text of the statute, or of its legislative history or of its judicial gloss, that Congress intended, via section 2(b), to

keep the Robinson-Patman Act from making a complete shamble of our traditional notions of a free economy, but at the same time intended, via section 2(a), to give treble damages to persons who were not even subject to the statutory defense.

Plaintiff, however, argues that since Congress did not expressly limit section 2(a) so as to give standing to sue in a primary-line case only to persons who directly compete with defendant for the same customers, we would, in establishing such a requirement, be doing what the Supreme Court has said not to do: adding to the congressional language an "alien factor * * * [which] would constitute a debilitating graft upon the statute." F. T. C. v. Anheuser-Busch, Inc., supra, 363 U.S. at 546, 80 S.Ct. at 1272, 4 L.Ed.2d 1385. Plaintiff has made the not uncommon mistake of relying on broad language which has no applicability to the case at bar. It is clear, we think, that the Court used the quoted language solely to explain why it would not adopt a construction which, in virtually all instances, would have removed from the ambit of the statute the primary-line case.[11] Clearly, the Act was intended to

resale price of his product and will fix that price in agreement with the distributor," and yet such conduct would seem to run afoul the price-fixing prohibition of Section 1 of the Sherman Act; 3) the manufacturer and its distributor might even "be in competition with each other in overlapping markets;" 4) "there is even the possibility that a manufacturer may discriminate between the competing independent distributors at the ends of the multiple channels of distribution." (Emphasis added).

10. Simplicity Pattern probably does not stand for any notion that section 2(b) is to be construed strictly. The Court merely held that the showing of "justification" mentioned in the first portion of that section referred to the various provisos found in section 2(a) and that since those provisos were not found in section 2(e), upon which the suit was based, there could be no justification for a section 2(e) offense. The Court pointed out there was good reason for Congress' having made the section 2(e) prohibitions absolute and that when one considered the contrasting language found in sections

2(a) and (e), the Court would "not supply what Congress has studiously omitted." That is hardly a mandate to the federal courts to construe section 2(b) "strictly." The Court merely adopted a reasonable construction.

11. The Court of Appeals had held that, in order for there to be price discrimination which would give rise to a primary-line case under Section 2(a), there must be some relationship between the different purchasers of the seller which would entitle them to comparable treatment. Such a relationship would exist if the different purchasers were in competition with each other. However, the Supreme Court reasoned that although the "existence of competition among buyers who are charged different prices by a seller is obviously important in terms of adverse effect upon secondary-line competition, * * * it would be merely a fortuitous circumstance so far as injury to primary-line competition is concerned." 363 U.S. at 546, 80 S.Ct. at 1272. Bearing in mind that one of the important purposes of Section 2(a) was to protect competitors of the discriminating seller,

encompass those cases. Thus, we cannot accept Anheuser-Busch as a proscription against the courts' using their sound judgment in refusing to extend the Act to unintended areas.

■ Finally, plaintiff advances the companion argument that we should not restrict 15 U.S.C.A. § 15 as we intend to do, since Congress has not expressly limited that statute to persons who are in direct competition with the defendant. Plaintiff's reliance on Radovich v. National Football League, supra, 352 U.S. at 453, 77 S.Ct. at 394, is, we believe, misplaced. As we read that case, the plaintiff's claim must still be tested under those principles set forth in the substantive statute which give rise to use of the procedural statute. In Radovich, the complaint only had to be " 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' [citation omitted] and meet the requirement that petitioner has thereby suffered injury." Ibid. But, the Robinson-Patman Act, as we view it, has prohibitions substantially narrower than those contained in the Sherman Act.[12] The broad language of Radovich is not of much help when we bear in mind that, in a primary-line case, the Robinson-Patman Act is only concerned with injuries to competition, a concept which we have found not to be so elastic as to encompass those parties who do not directly compete with the defendant.

■ Finally, plaintiff cautions the Court that by relieving it of the right to sue, the Court would be disregarding "the allegation recited in paragraph 13 of the second amended complaint that defendant's 'price discrimination enabled the Las Vegas distributor to maintain the existing price level of bakery products in Las Vegas,' which is a *per se* injury to competition in which plaintiff is engaged." Construed broadly, plaintiff has attempted to allege price-fixing. But, although price-fixing is illegal per se under section 1 of the Sherman Act, this is an action brought under the Robinson-Patman Act, which, so far as we know, has never been construed to encompass price-fixing as such. As we have noted already, plaintiff has previously filed with the Court an express abandonment of any claim based on the Sherman Act.

## SUMMARY

Plaintiff has not alleged facts which are sufficient to bring it within the pro-

---

the Court went on to point out that the Circuit Court's construction would have the effect of reading out of the Act such protection, save as there might exist the fortuitous circumstance that a seller would discriminate between buyers who were in competition with each other.

12. To begin with, Sherman Act section 1 speaks of "restraint of trade of commerce," which is a concept substantially broader than the references in Robinson-Patman to injury to "competition." See Note, Competitive Injury Under the Robinson-Patman Act, 74 Harvard L.Rev. 1597, 1614 (1961), where the author interprets Anheuser-Busch, supra, as "focusing the issues on the competitive-injury requirement. * * *"

See, as an example of the difference in scope between the Sherman Act and Robinson-Patman Act, Sears, Roebuck & Co. v. Blade, 110 F.Supp. 96, 101 (S.D.Cal., 1953), where the court held that under the latter Act there must be allegation and proof that the actions "complained of are *actually in* interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have *affected* interstate commerce." (Emphasis added). Accord: Lewis v. Shell Oil Co., 50 F.Supp. 547, 549 (N.D. Ill., 1939).

Compare United States v. Investors Diversified Services, Inc., 102 F.Supp. 645, 649 (D.Minn., 1951), where the court made the following observation: "That the broad terms and constructions of the Sherman Act cannot be transplanted automatically into Section 3 of the Clayton Act is evident. As Justice Frankfurter pointed out in Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, at page 297 [parallel citation omitted] Section 3 of the Clayton Act is a 'narrower Act' than the Sherman Act. Each Act must be interpreted in light of its own provisions. Although the Clayton Act may be supplementary to the Sherman Act, it is not co-extensive with it."

tection of the statute, and we are confident that the requirements of proof are such that even if plaintiff were granted leave to amend, it would not be able to prove that it was in competition with the defendant. Accordingly, this Court has no jurisdiction under the statute to adjudicate the controversy. Since it is hornbook law that a District Court may notice lack of jurisdiction at any time, we do so and shall dismiss the complaint.

## ORDER

It is, therefore,

ORDERED, That plaintiff's second amended complaint be, and the same hereby is, dismissed and that the above-entitled action be, and the same hereby is, dismissed.